UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WEIS-BUY FARMS, INC., | : | |
| Plaintiff, | : | |
| and | : | |
| FORLIZZI & BIMBER, INC., | : | |
| Plaintiff-Intervenor, | : | |
| vs. | : | No. 3:11cv02011(MRK)(WIG) |
| QUALITY SALES LLC, | : | |
| MIKE GIANATTI, | | |
| LARRY GIANATTI III, | : | |
| JERI FRASER, | | |
| RANDY DOUGAN, | : | |
| and LARRY GIANATTI II, | | |
| | : | |
| Defendants. | | |

-----------------------------------------------------X

RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [DOC. # 10]
AS TO DEFENDANT MICHAEL GIANATTI

On December 27, 2011, Weis-Buy Farms, Inc. ("Weis-Buy") brought this suit under the

Perishable Agricultural Commodities Act, 1930, as amended ("PACA"), 7 U.S.C. § 499e, *et seq.*,

against Defendants Quality Sales LLC, and Michael Gianatti,[1] Larry Gianatti III, Jeri Fraser,

Randy Dougan, and Larry Gianatti II,[2] individually, seeking, *inter alia*, to enforce PACA's

statutory trust provisions and to recover $171,081.30 in unpaid invoices for produce sold in

---

[1]  Although Michael Gianatti is listed on the docket sheet as "Mike Gianatti," throughout the hearings, he was referred to as "Michael," which is the name the Court will use in this Ruling.

[2]  During the hearing, Larry Gianatti II, who is the father of Michael Gianatti and Larry Gianatti III, was referred to as Larry II, Larry Junior, and Larry Senior.  The Court will refer to him as Larry Gianatti II in this Ruling.

interstate commerce to Quality Sales LLC, plus interest and attorney's fees.  Weis-Buy moved

for a temporary restraining order, which was granted until January 11, 2012, and also sought a

preliminary injunction.  On January 4, 2012, Quality Sales LLC filed a voluntary petition for

relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the

District of Connecticut.  Thus, this action was automatically stayed as to Quality Sales LLC.[3]

Neither counsel for Quality Sales LLC nor the Bankruptcy Trustee participated in these

proceedings.

On January 6, 2012, Forlizzi & Bimber, Inc., ("Forlizzi & Bimber") filed an unopposed

motion to intervene and complaint in intervention, likewise seeking to enforce PACA's statutory

trust provisions and to recover from Defendants the principal amount of $305,938.50, in unpaid

invoices for produce sold in interstate commerce to Quality Sales LLC, plus interest and

attorney's fees.  The Court granted the motion to intervene and extended the temporary

restraining order to cover the claims of Forlizzi & Bimber.

An evidentiary hearing on Plaintiff's Motion for Preliminary Injunction was held before

the Undersigned over the course of two days, January 10 and 17, 2012.[4]  In the interim, the

parties had entered into Stipulations and Consent Preliminary Injunctions as to each of the

Defendants, which the Court approved and so ordered.  As to Larry Gianatti II and Jeri Fraser,

the Stipulation and Consent Preliminary Injunction, as amended, will not expire until February

20, 2012, and neither they nor their attorney participated in the second day of the hearing.  As to

---

[3]  Unless otherwise indicated, throughout this Ruling, the term "Defendants" shall refer
only to the individual Defendants and shall not include Quality Sales LLC.

[4]  Pursuant to 28 U.S.C. § 636(c), all parties consented to the referral of this matter to the
Undersigned for purpose of a hearing and ruling on the Motion for Preliminary Injunction.

Defendants Larry Gianatti III and Randy Dougan, the parties agreed to leave the Stipulations and Consent Preliminary Injunctions in effect until a trial on the merits or such other time as they seek relief from the consent injunction.  However, as to Defendant Michael Gianatti, the parties chose to proceed with the hearing.  His Stipulation and Consent Preliminary Injunction remain in effect only until further order of this Court.  Accordingly, this Ruling pertains only to Plaintiff's Motion for Preliminary Injunction against Defendant Michael Gianatti and will supersede the Consent Preliminary Injunction.

Upon careful review of the testimony, the exhibits, affidavits, and all other evidence presented, as well as the parties' proposed findings of fact and conclusions of law and the arguments of counsel, the Court hereby renders the following Findings of Fact and Conclusions of Law on Plaintiff's Motion for Preliminary Injunction as to Defendant Michael Gianatti, individually.

<u>The Evidence</u>

1.  Weis-Buy and Forlizzi & Bimber are wholesale sellers of perishable agricultural commodities in interstate commerce and are licensed pursuant to PACA by the United States Department of Agriculture ("USDA").  Both companies operate their respective businesses under a valid PACA license.  Weis-Buy has its principal place of business in Fort Myers, Florida. Forlizzi & Bimber has its principal place of business in Chelsea, Massachusetts.

2.  Quality Sales LLC is a Connecticut limited liability company with its principal place of business in Hartford, Connecticut, and was also the holder of a PACA license issued by the USDA.  At all times relevant hereto, Quality Sales LLC was engaged in the business of buying wholesale produce from suppliers, such as Weis-Buy and Forlizzi & Bimber, and then selling the

produce to retailers, such as Stop & Shop, Giant, and Stew Leonard's grocery stores.  Quality Sales LLC was also a re-packer, often re-packing the produce before reselling it.

3.   At all times relevant to this lawsuit in 2011, the members of Quality Sales LLC were Larry Gianatti II, who owned a 50% interest, his wife Jeri Fraser, who owned a 30% interest, and Frank Buchiero, who owned a 20% interest.  Larry Gianatti II's sons, Michael Gianatti and Larry Gianatti III, were never members of Quality Sales LLC, nor was Larry Gianatti's son-in-law, Randy Dougan ever a member.

4.   Larry Gianatti II held himself out as President of Quality Sales LLC.  Michael Gianatti was Executive Vice President, and Larry Gianatti III and Randy Dougan were both Vice Presidents.

5.   The Blue Book, which one witness described as the "number one resource of produce companies," listed Michael Gianatti as Executive Vice President and Larry Gianatti III and Randy Dougan as Vice Presidents of Quality Sales LLC, but it did not list Larry Gianatti II.

6.   Quality Sales LLC's PACA license, which was issued in 1997, listed only Larry Gianatti and Jeri Fraser as "principals."  (At that time, Frank Buchiero was not a member.  He purchased his 20% interest from Larry Gianatti II in early 2011.)  The annual report for Quality Sales LLC filed with the Connecticut Secretary of State listed Larry A. Gianatti as the only member.   Testimony established that the "Larry Gianatti" on the PACA license and "Larry A. Gianatti" on the annual report referred to Larry Gianatti II, not Larry Giannatti III.

7.   Michael Gianatti, Larry Gianatti III, and Randy Dougan were salaried employees of Quality Sales LLC and received a payroll check, in the same manner as the other employees, of which there were approximately 40 to 60, depending on the seasonal needs of Quality Sales LLC.

The only other payments that Michael Gianatti, Larry Gianatti III, or Randy Dougan would have received were reimbursements for company expenses.

8.  Michael Gianatti began working at Quality Sales LLC in approximately 1996, after 15 years in the construction industry.  He began working on the loading docks and worked his way up to Executive Vice President.

9.  In 2011, the day-to-day operations of Quality Sales LLC were handled by Michael Gianatti, Larry Gianatti III, and Randy Dougan.  Each person had specific responsibilities. Michael Gianatti was primarily responsible for buying produce.  Larry Gianatti III was primarily involved with sales, compliance issues, audits, and third-party projects.  Randy Dougan was primarily responsible for purchasing packaging materials for the re-packing of produce. Additionally, Lisa Martin served as the office manager and bookkeeper for Quality Sales LLC, and John Klein was responsible for putting together the purchase orders after Michael Gianatti had made arrangements for the purchase of produce.  Larry Gianatti II was considered to be the top person at Quality Sales LLC, but he was not part of the day-to-day operations.  Although he was not at the office everyday, he was generally in contact by telephone almost everyday.  At times, he would come into the office for a half day; at other times, he would be there a couple of days at a time.

10.  Michael Gianatti testified that he considered the "management team" to consist of Lisa Martin, John Klein, Larry Gianatti III, and himself.  Lucas DiBenedetto, a former employee who left Quality Sales LLC in 2010 after being confronted with some inventory irregularities, was also part of that "team" until his departure from the company.

11.  Quality Sales LLC maintained its operating account with Bank of America ("BAC").

5

At all times relevant hereto, all proceeds from the sale of produce went into this account.

Likewise, all invoices for the purchases of produce were paid out of this account.  The only cash

transactions of Quality Sales LLC were for produce sold to walk-in customers.  Michael Gianatti

estimated that these sales generated approximately $20,000 per month.  This money was also

deposited into the BAC operating account.  Additionally, ordinary business expenses were paid

out of the BAC operating account.  For example, in November and December 2011, payments

were made out of this account for Quality Sales LLC's payroll, condominium fees for a

Riverpoint Condominium that was owned by Larry Gianatti II or an LLC of which he was a

member, Peerless Insurance, Wells Fargo for a loan/lease, Nissan Motor Co., DirecTV, American

Express for Larry Gianatti.  These are just a few of the expenses paid out of this account to

entities other than sellers of produce.

12.  Until approximately 2006, Larry Gianatti II was the only authorized signatory on this

BAC account.  If he was not available to sign checks, he would instruct Michael Gianatti, Larry

Gianatti III, or Randy Dougan to sign his name.  In approximately 2006, Michael Gianatti was

added as a signatory to the account.  However, he could only sign checks that his father, Larry

Gianatti II, had approved for payment.  He had no authority to decide which bills to pay and

which bills not to pay.  Occasionally, out of habit, he would still sign his father's name instead of

his own name to a check.  No payments were ever made out of the BAC operating account that

were not approved by Larry Gianatti II.  Michael Gianatti never opened bank statements from

BAC.

13.  Approximately one to two times a week, Michael Gianatti, who handled the purchase

of produce, and Randy Dougan, who handled the purchase of packaging, would put together a list

of vendors that needed to be paid.  This was a hand-written list of vendors' names without the amounts due and owing.  They would give this list to Lisa Martin, and she would then transmit a list to Larry Gianatti II.  Larry Gianatti II would then approve the payments to the vendors.  If there were insufficient funds in the operating account to pay all of the bills, he would decide which vendors would not be paid.  He did not consult with Michael Gianatti or Larry Dougan about these decisions.  Michael Gianatti would not know that a vendor had not been paid unless he received phone calls from the vendor inquiring about the status of the overdue payment.  He had no authority to override his father's decision not to pay a particular vendor.  Lisa Martin also frequently received calls from vendors who were looking for payment.

14.  Michael Gianatti testified that he was not responsible for making sure the produce companies were paid for produce that he bought to fill purchase orders that Quality Sales LLC had received from its customers.  Larry Gianatti II was responsible for making sure they were paid.

15.  Michael Gianatti did not handle the leases on any of the trucks Quality Sales LLC leased from Ryder Truck Rentals.  He did not sign any of the lease agreements, any loan documents, personal guarantees, or insurance documents.  These were signed by Larry Gianatti II, or possibly Jeri Fraser.  Although Michael Gianatti drove a car leased by Quality Sales LLC, he does not recall signing a lease for the car, although he believes that he signed a document showing that he was the driver of the car.  In 2010 and 2011, when Larry Gianatti II, loaned approximately $900,000 to Quality Sales LLC, Michael Gianatti, following instructions from his father, signed the loan documents "accepted by Michael Gianatti."

16.  According to Michael Gianatti, Larry Gianatti II controlled from whom Quality Sales

LLC bought produce.

17.   Once Michael Gianatti placed an order for the purchase of produce, an email was sent to everyone on the "management team" with the purchase order.  Larry Gianatti II did not receive these emails.  The purchase orders generally listed "Mike G" as the buyer.

18.   As the main buyer for Quality Sales LLC, Michael Gianatti maintained a relationship with the salesmen of the vendors from which he bought produce.  Each morning, he would receive emails from his vendors with prices for their produce and he would reach agreements with them as to the amount of produce to purchase to fill the purchase orders Quality Sales LLC had received.  Quality Sales LLC usually received purchase orders from their customers about one month in advance.  Larry Gianatti II spoke with Michael Gianatti on a daily basis about these purchases to ensure that Quality Sales LLC had enough produce on hand to fill their orders.

19.   Once the produce arrived at Quality Sales LLC's place of business, it was inspected, purchase orders were filled, and the produce was shipped to customers of Quality Sales LLC. Payment from these customers used to be received in about 15 days, but it later became 30 to 35 days.  The price that Quality Sales LLC received for produce it sold was always higher than the price it paid to purchase the produce.

20.   Quality Sales LLC expected to collect on all of its accounts receivable.  Michael Gianatti testified that Quality Sales LLC did not sell to accounts that had a history of not paying.

21.   Quality Sales LLC had total sales in 2009 of approximately $29,000,000.  Total sales decreased in 2010, and again in 2011.

22.   Toward the end of 2011, Quality Sales LLC, was not paying all of its vendors because there was not enough money in the BAC operating account to pay them.  Quality Sales

8

LLC had lost some of its major customers after it did not pass a third-party audit. The greenhouse project in Maine had not gotten off the ground. In late 2010, Larry Gianatti II had discovered major discrepancies in the inventory figures, which he attributed to defalcation by a company employee. Michael Gianatti testified that in the fall of 2011, vendors were calling him and pressuring him for payment. In deciding which vendors to pay, Larry Gianatti II would give priority to a vendor who might be able to affect business going forward. By the end of 2011, Larry Gianatti II would often not authorize payment to vendors that were no longer supplying produce to Quality Sales LLC. Michael Gianatti testified that, although he had conversations with his father about the importance of making payments to their produce vendors, he does not recall voicing any objections about payments made to vendors other than the produce companies.

23. By the end of 2011, Quality Sales LLC was no longer making matching contributions to the employees' 401(k) plans.

24. In 2011, Michael Gianatti was aware that Quality Sales LLC was having difficulty paying its bills, but otherwise, he did not pay attention to the financial condition of the company.

25. The BAC bank statement for Quality Sales LLC's operating account for month-end November 2011 reflects deposits of $831,090.45, withdrawals of $972,430.08, and an ending balance of $70,659.22. The BAC bank statement for month-end December 2011 reflects deposits of $865,271.37, withdrawals of $935,930.59, and an ending balance of $0.00.

26. Quality Sales LLC quit doing business on December 24, 2011. Larry Gianatti II made the decision to file for bankruptcy protection, and he alone signed the bankruptcy petition as manager of Quality Sales LLC. Michael Gianatti was not consulted nor involved in the decision to file for bankruptcy protection.

27.  Larry Gianatti II also made the decision to file suit against Quality Sales LLC's former accountants, seeking to recover damages for their accounting and oversight errors.  Larry Gianatti II and Quality Sales LLC are the two named plaintiffs in that lawsuit filed in State Court in Connecticut.

28.  The schedules attached to the Bankruptcy Petition filed by Quality Sales LLC show assets of just over $1,000,000 and liabilities exceeding $5,200,000.  The outstanding accounts receivable were $584,777.65.

29.  Weis-Buy and Forlizzi & Bimber are just two of the unpaid PACA beneficiaries.  Michael Gianatti acknowledged that there are probably 6 to 8 more, with claims totaling in excess of $1,000,000.

<u>Weis-Buy</u>

30.  Quality Sales LLC, began doing business with Weis-Buy a little over a year ago.  Michael Shapiro was the salesman for Weis-Buy for the Quality Sales LLC account.  All purchases of produce from Weis-Buy were made by Michael Gianatti for Quality Sales LLC.

31.  Until October 2011, Quality Sales LLC always paid the bills owed to Weis-Buy, although payments were sometimes late.  Until October 2011, Weis-Buy extended a credit limit of $50,000 to Quality Sales LLC, which limited their outstanding purchases to $50,000.

32.  In September 2011, Larry Gianatti II met with Shapiro for the first time and described to him his plans for expanding Quality Sales LLC's business throughout New England.  Larry Gianatti II indicated that he had more investments coming into Quality Sales LLC.  Shapiro testified that he considered Larry Gianatti II the "top" person at Quality Sales LLC

33.  In October and November 2011, Shapiro had a number of telephone conversations

10

with Larry Gianatti II about increasing the credit limit for sales from $50,000 to $200,000.  Larry Gianatti II told him that Quality Sales LLC had been in business for 20 years, had always paid its bills, and he assured Shapiro that Weis-Buy would be paid in a timely manner.   He told Shapiro that they were making "good money" on their colored peppers that Quality Sales LLC was purchasing from Weis-Buy, and they needed to increase their credit limit to increase their purchases.  Michael Gianatti was not involved with any of these conversations.  Shapiro obtained approval to increase the credit limit to $200,000 and communicated this to Larry Gianatti II. Larry Gianatt II then informed Michael of the increase and instructed him to purchase additional produce from Weis-Buy.  Thereafter, Shapiro had numerous conversations with Michael Gianatti about additional orders for new produce.

34. Once an agreement was reached between Shapiro and Michael Gianatti for the sale of produce to Quality Sales LLC, Larry Klein would generate a purchase order.  As soon as the produce was shipped from the supplier, Shapiro would receive a confirmation from the shipper. He would make a notation on the purchase order, sign it, and fax it to Quality Sales LLC so that they would know the produce was en route.  As soon as the produce was picked up for shipment, Weis-Buy would generate an invoice and send it to Quality Sales LLC.

35.  The invoice listed the payment terms, which were 10 days.  The invoice further provided for interest on any past-due accounts at the rate of 1.5% per month and stated that the buyer was responsible for all costs of collection, including attorney's fees and costs, in the event a collection action became necessary.

36.  The bottom of the invoice further provided that any claims for shortage, damage, or condition would not be honored unless the problem was reported in writing within 8 hours of the

buyer's receipt of the produce and a timely USDA inspection was performed on the produce.

Quality Sales LLC was a re-packer and often requested USDA inspections, which allowed them

to reject any produce that they could not sell.  Additionally, they classified produce as #1 quality

or #2 quality.

37.  The invoice also included the following PACA language:

> The perishable agricultural commodities listed on this invoice are
> sold subject to the statutory trust authorized by section 5c of the
> Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e).
> The seller of these commodities retains a trust claim over these
> commodities, all inventories of food or other products derived
> from these commodities, and any receivables or proceeds from the
> sale of these commodities until full payment is received.

38.  Although the invoice stated that payment was due in 10 days, which time period

commenced on Quality Sales LLC's receipt of the produce, Quality Sales LLC sometimes took

as much as 30 or even 45 days to pay.

39.  There are six outstanding invoices dated between October 31, 2011, and December

15, 2011, for produce (tomatoes and peppers) sold by Weis-Buy to Quality Sales LLC that were

never paid.  Michael Giannati acknowledged receiving this produce from Weis-Buy and testified

that, while there were some quality issues with some of the produce, once the invoices were

adjusted, they accurately reflected the outstanding obligation of Quality Sales LLC to Weis-Buy,

which he conceded was in the principal amount of $171,081.30.

40.  Quality Sales LLC did not make any payments to Weis-Buy in November or

December 2011.  During the week before Christmas, Shapiro tried to contact representatives of

Quality Sales LLC by telephone, emails, and text messages, about their outstanding unpaid

invoices.   When he received no response, on December 26, 2011, Shapiro personally went to

Quality Sales LLC and determined that the business was closed.

41.  Weis-Buy paid its suppliers for all of the produce sold to Quality Sales LLC even though Weis-Buy did not receive payment from Quality Sales LLC.

Forlizzi & Bimber

42.  Michael Gianatti's primary contact at Forlizzi & Bimber was Angelo Melito.  Larry Gianatti II did not deal with Forlizzi & Bimber.

43.  Sales by Forlizzi & Bimber to Quality Sales LLC were on an open account basis subject to the terms and conditions set forth on the invoices.  The terms of sale were 21 days. Additionally, the invoices provided that the customer assumed all costs of collection, including attorney's fees.  The invoices also contained the PACA statutory trust language set forth above.

44.  Quality Sales LLC did not pay the August 2011 invoices until October 2011.  These were the last invoices paid.   The last order that Quality Sales LLC placed with Forlizzi & Bimber was in October 2011.

45.  The principal balance due and owing to Forlizzi & Bimber by Quality Sales LLC is $305,938.50.  This is for unpaid invoices from September 13, 2011, to October 10, 2011.

46.  Michael Gianatti put Forlizzi & Bimber on the list of payees every week during the latter part of 2011.  Lisa Martin related to Michael Gianatti that she had been receiving calls from Forlizzi & Bimber about unpaid invoices.  Additionally, Melito contacted Michael Gianatti in November and December 2011 about the slow payments.  He promised to put Folizzi & Bimber on the list of payees, but his father made the final decision as to which vendors would be paid. These were the only efforts Michael Gianatti made to have Forlizzi & Bimber paid.

<u>Findings of Fact & Conclusions of Law</u>

1.  This Court's federal question jurisdiction, 28 U.S.C. § 1331, is invoked pursuant to 7 U.S.C. § 499e(c)(5), which gives the United States district courts jurisdiction to entertain actions by trust beneficiaries to enforce payments from the PACA trust.

2.  This case comes before the Court on a motion for preliminary injunction filed by Plaintiff Weis-Buy.  The Second Circuit has recently reaffirmed its adherence to the preliminary injunction standard set forth in numerous decisions over the past five decades.  A party seeking a preliminary injunction is required to show "(a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  The Court in *Citigroup* explained that the "'serious questions'" standard [allows a court] to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims but where the costs outweigh the benefits of not granting the injunction."[5]  *Id.*  "The very purpose of an injunction . . . is to give temporary relief based on a preliminary estimate of the strength of plaintiff's suit, prior to the resolution at trial of the factual

---

[5]  The Court recognizes three limited exceptions to this general standard, none of which apply here: (1) where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme; (2) where the requested injunction would provide the moving party with all of the relief that is sought and could not be undone by a judgment favorable to the defendants; and (3) where a mandatory preliminary injunction is sought that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo. *Citigroup Global Markets, Inc.*, 598. F.3d at 35 n. 4.  In those cases, the Second Circuit requires the moving party to show a likelihood of success on the merits.

disputes and difficulties presented by the case." *Id.*

3. PACA provides growers and suppliers of perishable agricultural commodities with a "self-help tool enabling them to protect themselves against the abnormal risk of losses resulting from slow-pay and no-pay practices by buyers or receivers of fruits and vegetables." *D.M. Rothman & Co. v. Korea Commercial Bank of N.Y.*, 411 F.3d 90, 93 (2d Cir. 2005). Under PACA, perishable commodities or proceeds from the sale of those commodities are held in trust by the buyer for the benefit of the unpaid seller until full payment is made. *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 705 (2d Cir. 2007); *"R" Best Produce, Inc. v. Shulman-Rabin Marketing, Corp.*, 467 F.3d 238, 241 (2d Cir. 2006). PACA provides:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions . . . and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2). "[T]he legislative history and the text of the statute as well as the implementing regulations all make clear that trust assets are intended exclusively to benefit produce sellers." *"R" Best Produce, Inc.*, 467 F.3d at 242. Additionally, "a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full." *In re Kornblum & Co.*, 81 F.3d 280, 286 (2d Cir. 1996). It is not limited to the specific produce supplied by a particular seller or the proceeds from the sale of that specific produce. *Id.* at 284. "The trust arises upon the commencement of the produce purchaser's business and receipt of perishable agricultural

15

commodities, and is continually in existence throughout the life of the purchaser's business."
*Anthony Marano Co. v. MS-Grand Bridgeview, Inc.,* No. 08 C 4244, 2010 WL 5419057, at * 5
(N.D. Ill. Dec. 23, 2010).

    4.  Quality Sales LLC was a "dealer" or "broker" under PACA and, thus, was a PACA
trustee.  7 U.S.C. §§ 499a(b)(6) and (7).

    5.  PACA also requires the licensing of all entities qualifying as commission merchants,
dealers, and brokers.  *See* 7 U.S.C. § 499c; *In re Kornblum & Co.*, 81 F.3d at 281.  Quality Sales
LLC was appropriately licensed under PACA.

    6.  PACA requires dealers and brokers to make prompt payment in full for all
commodities received from produce sellers.  *See* 7 U.S.C. § 499b(4); *American Banana Co. v.
Republic National Bank of N.Y., N.A.*, 362 F.3d 33, 36 (2d Cir. 2004).

    7.  As a produce dealer or broker, Quality Sales LLC was a PACA trustee, charged with
the duty "to insure that it had sufficient assets to assure prompt payment for produce and that any
beneficiary under the trust will receive full payment."  *D.M. Rothman & Co.,* 411 F.3d at 94.
PACA imposes a "nonsegregated 'floating' trust" on all perishable commodities and their
proceeds, in the sense that it permits buyers to commingle PACA trust assets.  7 C.F.R. §
46.46(b); *American Banana Co.*, 362 F.3d at 38.  As the Second Circuit held in *American
Banana Co.*, PACA affords produce sellers "a highly unusual trust beneficiary status that
pemit[s] them, in the case of defaults, to trump the buyers' other creditors, including secured
ones."  *Id.*

    8.  Weis-Buy and Forlizzi & Bimber were "suppliers or sellers" of perishable agricultural
commodities.  Weis-Buy and Forlizzi & Bimber met the eligibility requirements to participate in

the trust, in that, *inter alia*,  the terms of payment were less than 30 days, they provided written

notice of preserving trust benefits and, were licensed under PACA.  *See* 7 C.F.R. §§ 46.46(c), (e),

and (f); *see also Anthony Marano Co.,* 2010 WL 5419057, at * 5.  Thus, were PACA trust

beneficiaries.

9.  Trusts created by PACA are governed by general trust principles.  *American Banana

Co.*, 362 F.3d at 41.   The Restatement (Second) of Trusts § 283 (1959) defines a breach of trust

as "a violation by the trustee of any duty which as trustee he owes to the beneficiary."  *See

American Banana Co.,* 362 F.3d at 41.  Federal regulations prescribe the duties of a PACA

trustee, including maintaining trust assets in a manner such that assets are freely available to

satisfy outstanding obligations to sellers of perishable agricultural commodities.  7 C.F.R. §

46.46(d)(1).  Any act or omission that is inconsistent with that responsibility, including the

dissipation of trust assets, is unlawful and in violation of 7 U.S.C. § 499b, 7 C.F.R. §

46.46(d)(1), and a breach of the trustee's duty owed to the trust beneficiaries.  Additionally, that

same regulation defines "dissipation" as "any act or failure to act which could result in the

diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers,

sellers, or agents to recover money owed in connection with produce transactions."  7 C.F.R. §

46.46(a)(2).

10.  Based upon ordinary principles of trust law, the produce dealer or broker holds legal

title to the produce and the proceeds from its sale, but the seller retains an equitable interest in

the trust property pending payment.  *In re Kornblum & Co.*, 81 F.3d at 284.  Thus, in the event of

the dealer or broker's bankruptcy, the Bankruptcy Code excludes PACA trust assets from the

bankruptcy estate.  *Id.; see also Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346,

17

348 (S.D.N.Y. 1993).

11.  Additionally, an individual who is in a position to control the assets of a PACA trust and fails to preserve those assets may be held personally liable to the trust beneficiaries for breach of fiduciary duty.  *See, e.g., Golman-Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 351 (5th Cir. 2000); *Morris Okun, Inc.*, 814 F. Supp. at 348.  This legal framework is distinguishable from "piercing the corporate veil" doctrine, where the corporate form is disregarded because the individual has committed a fraud or because the corporation is a "shell" being used by individual shareholders to advance their own personal interests rather than the interests of the corporation.  *Morris Okun, Inc.,* 814 F. Supp. at 348.  While the corporation will be held liable in the first instance for the debt owed, individuals in a position to control trust assets who breached their fiduciary duties may be held secondarily liable for whatever amount of the debt is not recoverable from the corporation.  *Id.* at 349-50.

12.  The courts have held that individual liability turns not on whether the individual nominally held an officer position nor even the size of his or her shareholding, but whether he or she had the authority to direct the control of the PACA trust assets.  *See Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.*, 623 F.3d 163, 169 (3d Cir. 2010); *see also Grimmway Enters., Inc. v. PIC Fresh Global, Inc.*, 548 F. Supp. 2d 840, 849 (E.D. Cal. 2008); *Shepard v. K.B. Fruit & Vegetable, Inc.*, 868 F. Supp. 703, 706 (E.D. Pa. 1994).  "The test for individual liability continues un-brightlined, as each case depends on facts found by the trier at trial."  *Bear Mountain*, 623 F.3d at 169.

13.  In light of these principles and the facts of this case, the Court must decide whether

Plaintiffs[6] have carried their burden of showing irreparable harm if a preliminary injunction is not issued and that they have a likelihood of succeeding on their claim against Michael Gianatti for breaching any fiduciary duty owed to them as PACA beneficiaries, or that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and that, on balance, the hardships tip decidedly toward them.

14.   The Court has no difficulty holding that Plaintiffs have carried their burden of showing irreparable harm to them if an injunction is not issued to preserve the status quo.  As noted above, there is no issue as to the principal amounts due and owing by Quality Sales LLC to Weis-Buy and Forlizzi & Bimber.  It is clear that the corporation does not have sufficient assets to satisfy all of its PACA liabilities, which exceed $2,000,000.  Thus, if a judgment was entered in Plaintiffs' favor, any dissipation of PACA trust assets between now and when a judgment is entered would cause them irreparable harm in that they would not be able to fully collect on this judgment from the corporation.  However, the Court also finds that Michael Gianatti has shown that he would suffer irreparable harm if an injunction is issued against him as he is unemployed and is in the process of trying to sell his home.

15.   As to the merits of Plaintiffs' claims solely against Michael Gianatti, there is no question, based upon the evidence presented, that Michael Gianatti did not have the ability to control payments that were made from the BAC operating account, which held all assets of the PACA trust.  The decisions as to which vendors to pay were made by Larry Gianatti II.  The evidence was undisputed that Michael Gianatti was not authorized to sign corporate checks unless his father had first approved the payments.

---

[6]  As used herein, "Plaintiffs" refers to Weis-Buy and Forlizzi & Bimber.

16.   However, Michael Gianatti did have significant control over purchases made by Quality Sales LLC from its vendors.  Although his father would check with him on a daily basis to make sure that they had enough produce on hand to fill their purchase orders, Michael Gianatti testified that he got prices from the vendors in the morning, struck a deal with them as to how much produce to buy, and was listed as the buyer on the invoices from the vendors.  It is also clear that he was buying produce when he knew or, in the exercise of reasonable care, should have known that Quality Sales LLC was having financial problems and did not have sufficient funds to pay for the produce he was ordering - at least, not at the time the order was placed.  At the end of 2011, vendors were calling him and Lisa Martin looking for payments, he was aware of the defalcation of funds by a former employee, he knew that not all vendors were getting paid, matching contributions were no longer being made into his 401(k) plan, he was aware of his father's infusion of capital into the company, and he was aware that they had lost one or more major customers.  Although Michael Gianatti may not have known the depth of Quality Sales LLC's financial troubles in October and November 2011, he knew that Quality Sales LLC was having financial difficulties and that the vendors from which he was making purchases likely would not be paid on time.

17.   The difficult question for the Court is whether the evidence adduced at the hearing shows that Michael Gianatti was in a position to control PACA trust assets and that he breached his duty as a PACA trustee so as to subject him to secondary liability to the PACA beneficiaries.  Or, to phrase the issue more precisely in the context of Plaintiff's Motion for Preliminary Injunction, do Plaintiffs have a likely chance of succeeding on this claim at trial or are there sufficiently serious questions going to the merits that the status quo should be preserved to

minimize the irreparable harm to Plaintiffs if an injunction is not issued?

18. The Court can state unequivocally that there is no case directly on point.  Most of the cases holding a controlling person secondarily liable have involved claims against the sole shareholder, president or principal officer, and director of the corporation.  *See, e.g., Coosemans*, 485 F.3d at 706 (holding sole director and shareholder liable because he was in a position to control PACA trust assets); *Morris Okun, Inc.*, 814 F. Supp. at 348 (finding sole shareholder who controlled the day-to-day operations of the company liable under PACA); *Mid-Valley Produce Corp. v. 4-XXX Produce Corp.*, 819 F. Supp. 209, 213 (E.D.N.Y. 1993) (holding president liable but finding insufficient evidence to hold sole shareholder, who was not an officer, director, or employee of the corporation, or former directors liable); *Bronia, Inc. v. Ho*, 873 F. Supp. 854, 861 (S.D.N.Y. 1995) (finding sole shareholder to be "primary actor responsible" for corporation's breach of PACA trust); *see also Golden-Hayden Co.,* 217 F.3d 348, 352 (holding that sole shareholder manifestly had absolute control over the corporation despite his refusal or failure to exercise his right and obligation to control the corporation).  As the district court noted in a 1997 decision from the Northern District of Texas, *Ideal Sales, Inc. v. McGriff*, No. 3:95-CV-0991, 1997 WL 560779, at *3 (N.D. Tex. Sept. 2, 1997), "the cases reveal a willingness to hold the *primary actor responsible* for a breach of the trust, the sole or controlling shareholder, or the *president* personally liable, along with an unwillingness to hold other, less involved individuals personally liable."  However, since 1997, the cases do not draw such bright lines.  As the court in *Bear Mountain Orchards* recognized, there is no bright line litmus test.  623 F.3d at 169.  Each case turns on its own facts, and the inquiry is very fact-intensive.

19.  To that end, the Court has reviewed a significant number of decisions involving the

21

issue presented here - the secondary liability for breach of a PACA trust of someone other than the majority shareholder, president, or officer clearly in control of the corporation and the PACA assets.

20. The case probably the most favorable to Defendant is *Ideal Sales, Inc.,* cited above, in which the court refused to hold a 20% shareholder personally liable, who was described as the "deputy - the second-in-command," who had little dealing with the accounts payable, who had a "voice" in the business and financial affairs of the company as a shareholder and director, but whose primary duties were to buy and sell produce, keep customer relations, and maintain related records.   He alone did not make financial decisions and only rarely signed checks, although on one occasion he loaned a large sum of money to the company to help its cash flow.  1997 WL 560779, at *3.  The court also observed that corporate benefits provided to this minority shareholder, such as a credit card and company car, were irrelevant to the inquiry of his control over the financial affairs of the company.  *Id.* at n.2.  Significantly, in that case, the court found that the president, who owned 80% of the shares, was the "primary actor responsible" for the breach of the trust. *Id.* at *3.

21. *Bear Mountain Orchards* also favors Defendant's position.  There, the Third Circuit held that individual liability turned not on whether the individual nominally held an office or was a director or even the size of his or her shareholding, but rather on whether he or she had "the authority to direct the control of (*i.e.,* manage) PACA assets held in trust for the producers."  623 F.3d at 169.  In that case the wife, vice president of the corporation, a signatory on its bank accounts, and a 50% shareholder, was held not to be secondarily liable because she did not have actual control over the management by the corporation of the PACA products.  *Id.* at 170.   The

22

wife did participate in certain business transactions as a corporate officer, such as signing certain documents, but she was not involved in any of the corporation's major business decisions or the day-to-day management of the company. *Id.* at 173. She worked at the corporation on a part-time basis, performing basic operational, as opposed to managerial, tasks. *Id.* She remained her husband's "subordinate" in all business matters and took directions from him daily. *Id.* at 174. She took directions from her husband as to which checks to write and which loan documents to sign. *Id.* When the corporation was forced to close, her husband made the decision and simply told her after the fact. *Id.* She never wrote checks on her own, never reviewed any corporate documents her husband told her to sign, nor did she review the tax returns or instruct another employee to pay a vendor. *Id.* "Collectively," the court held, "this testimony supports the finding that she had no actual ability to manage the corporation, and hence no power to control its use of PACA trust assets." *Id.*; *see also William Consalo & Sons Farms, Inc. v. Drobnick Distributing, Inc.,* No. CV-10-049-TUC-CKJ, 2011 WL 1211911, at *8 (D. Ariz. Mar. 30, 2011) (refusing to find the wife secondarily liable for the dissipation of PACA trust assets, even though she was a salaried officer (secretary/treasurer), a director, and a shareholder, who had a corporate credit card that she used for personal expenses, and who received contributions to her retirement account out of the corporation's general operating account).

22. On the other hand, the Court has also considered the decision in *Basciani Foods, Inc. v. Roy Enterprises, Inc.*, No. 3:09-cv-01182, 2010 WL 3702615 (S.D.W. Va. Sept. 16, 2010), which favors Plaintiffs' position in this case. There, the court held that an employee, who was not an officer, director or shareholder, but who was listed in the Blue Book and with the Secretary of State as vice president and who had signatory authority on corporate checks, was in

a position to control PACA trust assets.  *Id.* at *3.  This case, however, was before the court on

an unopposed motion for summary judgment.

23.  Plaintiff's counsel argued that the Court should look at "touch points."  The Court

has found no case suggesting that this is the proper test, as "touch points" do not necessarily

equate to control.  Indeed, the case of *Onions ETC., Inc. v. Z & S Fresh, Inc.*, No. 1:09-cv-00906,

2011 WL 3348039 (E.D. Cal. Aug. 2, 2011), seems to reject such an approach.  There, the court,

in ruling on a motion for summary judgment, found genuine issues of material fact as to whether

two individuals, the Schoenburgs, who were directors of the corporation Z & S, were in a

position to control PACA trust assets.  The evidence showed that one, L. Schoenburg, was an

original applicant for the PACA license, he was listed as a principal on the license, and was vice

president of the corporation.  He picked up corporate checks, cashed them at various banks and

returned the money to the third director and president, Zaninovich.  He was on the payroll,

received a credit card for personal expenses that were billed to the corporation, and signed loan

documents on behalf of the corporation.  His wife, M. Schoenberg, was secretary/treasurer; she

cashed at least 13 corporate checks at the request of her husband; she received a salary, a

corporate credit card, and a car leased by the corporation.  She also signed loan documents on

behalf of the corporation.  Neither, however, was a shareholder.  They provided evidence that the

president and third director, Zaninovich, had complete and total control of the corporation and

PACA trust assets.  They claimed that they signed documents only at the direction of the

president and exercised no control over the purchases, sales, or payments for perishable

agricultural commodities or any other corporate financial matters.  They also did not have access

to financial records or corporate books and records and did not have the authority to sign checks

24

drawing on the corporate account.  *Id.* at * 13.  The court concluded that, "[b]ased on the Schoenburgs' assertion of Zaninovich's dominance and control over Z & S operations and the Schoenbergs' minimal involvement, knowledge of the business operations, and lack of day-to-day participation in the business of Z & S, the Schoenbergs have presented enough evidence to create a genuine issue of fact for trial.  Drawing all inferences in favor of the Schoenburgs, a reasonable trier of fact could conclude that the Schoenburgs were not in a position to control PACA trust assets during the relevant time period."  *Id.*  at *14.

24.  Clearly, the facts of the instant case are distinguishable from *Onions*.  In some respects this case both helps and hurts each side in the instant case.  Additionally, it is significant that the case arose in the context of a motion for summary judgment and that the court did not rule on the ultimate issue but found genuine issues of material fact.  Nevertheless, it demonstrates how fact-intensive each case is and how the focus of the inquiry must be on the individual's ability to control PACA trust assets, not on the number of "touch points."

25.  In *Anthony Marano Co.*, the district court considered the following factors in determining personal liability, including whether the individual was a director, whether he had a role in causing the company to commit a breach of trust, whether he had control over the day-to-day operations, whether he was active in the management of the company, whether he signed for company accounts, and whether he was the primary actor in failing to pay under PACA.  2010 WL 5419057, at *9.  There, the court held personally liable a one-third shareholder, who had served as vice president,[7] who served as night manager, who oversaw not only the produce but

_____

[7]  The evidence was disputed as to whether he still served in this capacity during the relevant time period.

also other trust assets, who was a signatory on the bank account  - although he could not sign

non-payroll checks without authorization, who attended shareholder meetings, but who did not

review the financial accounts.  *Id.* at *11.

26.  The Court concludes, after careful consideration of the evidence presented at the

preliminary injunction hearing, as well as a review of the relevant case law, that Plaintiffs have

not borne their burden of establishing a likelihood of success on the merits or even serious

questions going to the merits as to the secondary personal liability of Michael Gianatti so as to

warrant the imposition of a preliminary injunction.  The evidence shows that, other than

purchasing produce to fill orders, Michael Gianatti was not in a position to oversee the

preservation of trust assets. His involvement with Quality Sales LLC was not sufficient to

establish legal responsibility for the trust assets.  He carried the title of Executive Vice President,

but was not a member of manager of the LLC.  He was primarily involved in the purchase of

produce to fill existing orders, although at least to some degree, his father controlled from whom

he bought and how much he purchased.   He had little involvement in sales of the produce once it

arrived at Quality Sales.   He had signature authority over the BAC operating account, but he was

not authorized to sign any checks without Larry Gianatti II's express permission.  He had no

authority to determine which vendors to pay.  He worked as an employee.  He received a salary

and drove a company car.  He was not involved in any way in the decision to extend the credit

line with Weis-Buy.  He was not involved in the decision to file for bankruptcy or close the

business.  He was not privy to Quality Sales LLC's financial situation, although as noted above,

he clearly was aware that the company was having financial difficulties.  His testimony, however,

is undisputed that he did not know that the company would not survive.   Until the very end, he

thought all PACA creditors would be paid.  He had no responsibility for the collection of

accounts receivable or the payment of outstanding invoices other than to put the vendors' names

on a list that would be transmitted to his father.  This is not a situation where the purchaser of

produce bought the produce and let it rot on the docks, rendering the produce unmarketable.  *Cf.*

*Anthony Marano Co.*, 2010 WL 5419057, at *7.   To the contrary, Michael Gianatti testified that

all of the produce from Plaintiffs was sold and he expected to receive payment on 100% of the

accounts receivable.

27.  This is not to say that Plaintiffs may not prevail at trial once all of the evidence is

received.   The Court has not heard testimony from Larry Gianatti II or Jeri Fraser, who appear to

have interests adverse to the other Defendants.  But, the decision as to what evidence to present

at the hearing was made by Plaintiffs, not the Court.

28.  Based upon the evidence received, the Court finds that there is insufficient evidence

of Michael Gianatti's ability to exercise control over the PACA trust assets for the Court to find

that Plaintiffs have demonstrated that they are entitled to a preliminary injunction as to Defendant

Michael Gianatti.

29.  Having found that he was not a PACA trustee, the Court need not reach the issue of

whether he breached any fiduciary duties owed to the PACA beneficiaries.

<u>Conclusion</u>

Accordingly, the Court DENIES Plaintiff's Motion for Preliminary Injunction [Doc. # 10]

solely as to Defendant Michael Gianatti.  The Stipulation and Consent Preliminary Injunction

[Doc. # 50] as to Michael Gianatti is hereby terminated.

This is not a recommended ruling.  The parties consented to the referral of this motion to

27

the Undersigned for the purpose of a hearing and ruling.

     It is SO ORDERED, this __31st__ day of January, 2012, at Bridgeport, Connecticut.


                     ____/s/ *William I. Garfinkel*_____
                         WILLIAM I. GARFINKEL
                         United States Magistrate Judge